# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2730-22

IN THE MATTER OF C.R.R.

_____

Submitted February 4, 2025 – Decided March 6, 2025

Before Judges Chase and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Petition No. 0221 XTR 2022 000003.

Evan F. Nappen Attorney at Law, PC, attorneys for appellant C.R.R. (Ali Homayouni, on the briefs).

Mark Musella, Bergen County Prosecutor, attorney for respondent State of New Jersey (K. Charles Deutsch, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant C.R.R.[1] appeals from a final extreme risk protective order

(FERPO) entered against him pursuant to the Extreme Risk Protective Order Act

_____

[1] Records relating to FERPO proceedings are confidential and shall not be disclosed to persons other than the respondent except for good cause shown. Admin. Off. of the Cts., Admin. Directive #19-19, Guidelines for Extreme Risk

of 2018 (the Act), N.J.S.A. 2C:58-20 to -32.  Based on our thorough review of the record and prevailing law, we affirm.

I.

We discern the salient facts from the record developed at the FERPO hearing.  On November 13, 2022, Garfield Police Department (GPD) Officer Kopacz and several other officers, responded to a call from defendant's father, W.R., reporting an "armed suicidal male," later identified as defendant, ingested thirty Klonopin pills and threatened to shoot the police himself if law enforcement attempted to enter defendant's apartment.  When an investigation revealed defendant was the registered owner of several firearms, Kopacz notified the Bergen County Regional SWAT team.

Kopacz then spoke with defendant on the phone.  During this conversation, defendant stated, "he was a loser and had no direction in life," and advised his firearms were in a locked gun safe.  Defendant's brother, R.R., told Kopacz that defendant "has been depressed lately, but was under the care of a psychiatrist and was taking prescription medication."

Protective Orders attach. 1, Guideline 8(a) (Aug. 12, 2019) (hereinafter AOC Directive).  We also refer to certain individuals whose statements and testimony are included in the record by their initials to protect their privacy and the confidentiality of these proceedings.  R. 1:38-3(d)(9).

Law enforcement arrived at defendant's residence and, after defendant confirmed he took thirty Klonopin pills, Kopacz convinced him to leave the apartment unarmed. After he was frisked, defendant told Kopacz "he was unsure of his career and felt like he shouldn't live anymore." Kopacz did not observe any signs of overdose. Defendant gave the officers the key to his gun safe and verbal consent to retrieve the firearms from inside his apartment. Defendant was then involuntarily committed and taken to Hackensack University Medical Center (HUMC).

GPD recovered twelve firearms, two duffle bags, two green metal cans containing assorted ammunition, various high-capacity handgun and rifle magazines, and one inert "dummy" flashbang from defendant's apartment. GPD officers subsequently learned that one firearm, a Glock 43, was missing from the firearms recovered.

Kopacz returned to HUMC where he served defendant with a Temporary Extreme Risk Protective Order (TERPO), and learned from defendant the missing firearm was in defendant's Jeep along with illegal high-capacity magazines and hollow point bullets. Kopacz ultimately recovered the missing firearm from the Jeep.

Defendant testified that although he told his mother he consumed thirty

3

Klonopin pills, he did not intend to harm himself and lied to his mother about it because he "was very upset with her" and "wanted to scare her." Defendant sought treatment for anxiety through cognitive behavioral therapy and by consulting with a psychiatrist, who prescribed the Klonopin. Defendant testified he has improved since he began therapy and taking Klonopin but denied telling his family or Kopacz anything about his mental health status.

A letter written by defendant's psychologist, Dr. Kaplan, was moved into evidence. Dr. Kaplan stated defendant "presents with bipolar disorder and panic disorder," and during their sessions they "explored the reasons why [defendant] ingested a large quantity of anti-anxiety medication." In response, defendant testified he took "less than five" Klonopin on the night of the incident, not the thirty he told his mother and Kopacz he ingested.

After the TERPO was entered, defendant enrolled in Forge Health's intensive inpatient program for anxiety, followed by an outpatient program where he "attend[s] one to two sessions per week, three hours per session." In addition to taking Klonopin, defendant takes four other prescription medications for mental health disorders, sees his psychologist once a week, and consults with his psychiatrist every two weeks.

Defendant did not dispute the evidence establishing he was involuntarily

A-2730-22

committed to a mental health facility in 2011. A narrative from the 2011 commitment was read into the record, establishing: "[a]s per mom, patient is destroying property and throwing things plus suicidal ideation . . . [defendant] had a violent outburst throwing and breaking things and verbalized that [he] 'wants to hurt himself,' [and] there is no 'fun in life anymore.'"

Towards the end of the hearing, the trial court asked defense counsel for a proffer as to W.R.'s testimony. Counsel proffered W.R. would testify defendant's mother relayed to him that defendant told her he consumed "the drugs"; he was not told directly defendant was committing suicide or wanted to harm himself; and he called the police to be on the safe side. With the State's consent, the trial court stated it would accept the proffered testimony as "one hundred percent accurate," thus obviating the need to call W.R. to testify. Defense counsel did not object.

The trial court granted the FERPO in an oral decision, followed by written amplification pursuant to Rule 2:5-1(d). The trial court found Kopacz to be credible as he "spoke clearly and answered all of counsels' questions directly and without hesitation." Conversely, the trial court found defendant not credible since he "was evasive at times . . . failed to answer all questions directly," and "directly contradicted the accounts of his mother, father, brother, and responding

officers." The trial court determined "[defendant] repeatedly minimized the severity of his statements and his struggles with mental health . . . ."

The trial court found the following factors established in the record under N.J.S.A. 2C:58-23(f): one, the history of threats or acts of violence against self or others; two, history of use, attempted use, or threatened use of physical force against another person; seven, history of drug or alcohol abuse and recovery from this abuse; twelve, prior history of involuntary commitment in a hospital or treatment facility for persons with psychiatric disabilities; thirteen, past and present treatment of mental health disorders; fourteen, compliance or failure to comply with mental health treatment; and fifteen, diagnosis of a mental health disorder.

The trial court found factor one predicated on defendant's statements that he ingested thirty Klonopin pills and his threat to open fire on officers if they attempted to enter his apartment. The trial court relied on the undisputed proffer that W.R. was not directly told by defendant about his ingestion of the Klonopin. The trial court found defendant's statements to Kopacz, "that he was a loser, lacked direction in life, and [that he] wished to stop living," highlighted the significance of defendant's initial failure to disclose the location of the Glock 43 and his possession of illegal high-capacity magazines and hollow point bullets.

6

The trial court also considered defendant's undisputed admittance to a mental health facility in 2011 "following a violent outburst and suicidal statements."

Regarding factor two, the trial court cited to the threats of harming himself and others made to officers, reasoning "[t]hese were threats that deeply worried his parents because defendant possessed multiple firearms." The trial court also referenced defendant's 2011 commitment, finding "while much of [defendant's] behavior is self-harmful in nature, breaking things and throwing them around can pose a danger to others around [defendant]."

The trial court also found the record established factor seven, citing to defendant's "use of Klonopin in the instant situation," as confirmed by defendant's psychologist in writing. The trial court found factor twelve was established by evidence of his commitments in 2011 and 2022. The trial court pointed to evidence in the record establishing factors thirteen, fourteen, and fifteen based on R.R.'s statements defendant "suffered from depression and took psychotropic medications," defendant's testimony about his own medications, and the professional diagnosis regarding his daily "prescribed medications . . . for his anxiety and mental health disorders." The trial court also cited to Dr. Kaplan's diagnosis of defendant's bipolar and panic disorders, and his participation in counseling at a mental health clinic.

7

At the conclusion of the proceeding, the trial court entered the FERPO.

II.

Defendant appealed, arguing the following points:

POINT I

THE COURT BELOW ERRED BY FINDING FACTORS [ONE], [TWO] AND [SEVEN] UNDER N.J.S.A. 2C:58-23(F).

POINT II

THE COURT BELOW ERRED BY REACHING AND FINDING FACTORS [TWELVE] THROUGH [FIFTEEN].

POINT III

THE COURT BELOW ERRED BY GRANTING THE FERPO WHEN THE STATE FAILED TO PRESENT ANY EVIDENCE, OUTSIDE OF HEARSAY, THAT APPELLANT POSED A SIGNIFICANT DANGER OF CAUSING BODILY INJURY TO HIMSELF OR OTHERS.

POINT IV

AS APPLIED TO [DEFENDANT], THE FERPO ENTERED AGAINST HIM WAS A VIOLATION OF HIS INDIVIDUAL RIGHT TO BEAR ARMS IN SELF-DEFENSE UNDER THE SECOND AMENDMENT TO THE U.S. CONSTITUTION.

We address defendant's arguments in turn.

III.

We begin by acknowledging our review of a trial court's fact-finding function is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "A reviewing court is bound by the trial court's findings 'when supported by adequate, substantial, credible evidence.'" Peterson v. Peterson, 374 N.J. Super. 116, 121 (App. Div. 2005) (quoting Cesare, 154 N.J. at 412). Deference is particularly appropriate where the evidence is largely testimonial and hinges upon a court's ability to make credibility assessments. Cesare, 154 N.J. at 412.

The interpretation of a statute is a legal question, State v. Revie, 220 N.J. 126, 132 (2014), reviewed de novo, "unconstrained by deference to the decisions of the trial court . . . [,]" State v. Grate, 220 N.J. 317, 329 (2015). We will "not disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (alteration in original) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).

After careful review, we conclude the trial court did not err in entering the FERPO based on the substantial, credible evidence adduced at the FERPO hearing.

9

A.

The Act "permits the emergent removal of weapons from any person who poses a danger to self or others [and] . . . supplements other statutory mechanisms for removing firearms from persons who legally possess them." In re D.L.B., 468 N.J. Super. 397, 401 (App. Div. 2021) (citing N.J.S.A. 2C:58-3(f)). There is a two-step process to removing firearms: first the court decides if "it will issue a temporary order to remove firearms" and then, "after a plenary hearing, the court decides if it will issue a final order to remove [the] firearms indefinitely."[2] Id. at 401-02 (citing N.J.S.A. 2C:58-23 and N.J.S.A. 2C:58-24).

N.J.S.A. 2C:58-24(b) governs the issuance of FERPOs, providing in part:

> If the court finds by a preponderance of the evidence at the hearing that the respondent poses a significant danger of bodily injury to the respondent's self or others by having custody or control of, owning, possessing, purchasing, or receiving a firearm, the court shall issue an extreme risk protective order.

In considering a TERPO or FERPO application, N.J.S.A. 2C:58-23(f) requires a court to consider whether a respondent:

> (1) has any history of threats or acts of violence by the respondent directed toward self or others;

---

[2] N.J.S.A. 2C:58-25(c) sets forth the procedure for obtaining an order terminating a FERPO. Our reference to the modifiability of the FERPO should not be construed as reflecting any opinion as to whether the order at issue may be vacated in the future on subsequent application with sufficient proofs.

A-2730-22

(2) has any history of use, attempted use, or threatened use of physical force by the respondent against another person;

(3) is the subject of a temporary or final restraining order or has violated a temporary or final restraining order issued pursuant to the 'Prevention of Domestic Violence Act of 1991,' . . . ;

(4) is the subject of a temporary or final protective order or has violated a temporary or final protective order issued pursuant to the 'Victim's Assistance and Survivor Protection Act' . . . ;

(5) has any prior arrests, pending charges, or convictions for a violent indictable crime or disorderly persons offense, stalking offense pursuant to [N.J.S.A. 2C:12-10], or domestic violence offense enumerated in [N.J.S.A. 2C:25-19];

(6) has any prior arrests, pending charges, or convictions for any offense involving cruelty to animals or any history of acts involving cruelty to animals;

(7) has any history of drug or alcohol abuse and recovery from this abuse; or

(8) has recently acquired a firearm, ammunition, or other deadly weapon.

N.J.S.A. 2C:58-23(f) and N.J.S.A. 2C:58-24(b) must be read in harmony with each other and the Administrative Office of the Courts (AOC) Directive, which "summarizes the Act and promulgates Guidelines . . . that prescribe the process for obtaining orders under the Act." D.L.B., 468 N.J. Super. at 402.

"Because the AOC Directive implements the Court's constitutional power to promulgate rules governing practice and procedure and administration of the courts, the AOC Guidelines have 'the force of law.'" Ibid. (citing State v. Morales, 390 N.J. Super. 470, 472 (App. Div. 2007)).

A trial court must first find one of the "behavioral" factors has been established before considering factors twelve through fifteen, as to whether a defendant:

> (12) has any prior involuntary commitment in a hospital or treatment facility for persons with psychiatric disabilities;
>
> (13) has received or is receiving mental health treatment;
>
> (14) has complied or has failed to comply with any mental health treatment; and
>
> (15) has received a diagnosis of a mental health disorder.
>
> [Id. at 404 (citing AOC Directive Guideline 3(d)).]

No single factor is determinative, rather, in weighing each of the factors, "[t]he court shall issue the FERPO . . . if it finds 'by a preponderance of the evidence at the hearing that the [individual] poses a significant danger of bodily injury to the [individual's] self or others' by possessing a firearm." Id. at 406-07 (quoting N.J.S.A. 2C:58-24(b)).

We affirm entry of the FERPO, determining the trial court's findings are supported by adequate, substantial, and credible evidence. We defer to the trial court's factual findings based on its credibility determinations because they were not "so wide of the mark [such] that the judge was clearly mistaken." See N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007).

B.

We are unconvinced the trial court improperly considered the evidence "from the incident that [gave] rise to the petition for the subject TERPO or subsequent FERPO" in considering factors one, two, and seven. Our statutory interpretation of the plain language allows the trial court to consider "any history" of violence or physical force which, in this case, includes both the 2011 and 2022 involuntary commitments.

When interpreting a statute, "[t]he overriding goal is to determine as best we can the intent of the Legislature, and to give effect to that intent." State v. Robinson, 217 N.J. 594, 604 (2014) (quoting State v. Hudson, 209 N.J. 513, 529 (2012)). If a plain language reading of the statute "leads to a clear and unambiguous result, then our interpretive process is over." Richardson v. Bd. of Trs., PFRS, 192 N.J. 189, 195 (2007). Only if we find an ambiguity in the

statutory language, do we turn to extrinsic evidence, such as legislative intent. See State v. Olivero, 221 N.J. 632, 639 (2015).

We conclude since N.J.S.A. 2C:58-23(f)(1), (2), and (7) unambiguously qualify "history" with the term "any," the statute was meant to be construed expansively. "Any" is defined as "one or some indiscriminately of whatever kind . . . ." Merriam-Webster's Collegiate Dictionary, 647 (11th ed. 2022). Here, the plain meaning of the statute is clear, and therefore, we "'apply that plain meaning and end our inquiry.'" In re H.D., 241 N.J. 412, 418 (2020) (quoting Garden State Check Cashing Serv., Inc. v. Dep't of Banking & Ins., 237 N.J. 482, 489 (2019)).

## C.

We are also unpersuaded the trial court found the record established factors one and two under N.J.S.A. 2C:58-23(f) based solely on hearsay within hearsay. Our jurisprudence establishes a FERPO may be predicated in part, on hearsay, but "'there must be a residuum of legal and competent evidence in the record to support'" its issuance. D.L.B., 468 N.J. Super. at 406 (quoting Weston v. State, 60 N.J. 36, 51 (1972)).

We are satisfied the trial court did not base its decision in this case on hearsay alone. The court properly considered defendant's 2011 involuntary

14

commitment as evidenced by defendant's testimony and medical records; defendant's statements and actions concerning his Klonopin ingestion; statements by defendant's family that he was depressed; and his threat to shoot himself and the police. This admissible evidence, including that subject to a hearsay exception, paired with Kopacz's personal knowledge of weapons in defendant's possession at the time of the incident support the trial court's issuance of the FERPO. Based on this primarily non-hearsay evidentiary predicate, we conclude the trial court did not abuse its discretion in finding factors one and two were established and "supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12.

We are equally unconvinced by defendant's assertion the trial court erred in finding factor seven, history of drug abuse and recovery from such abuse, simply because defendant did not show signs of overdose. Whether or not symptoms of overdose were observed is not dispositive where defendant testified on cross examination, he "took less than five" Klonopin and offered no substantive response to his psychologist's letter confirming he and defendant "explored the reasons why [defendant] ingested a large quantity of anti-anxiety medication." (emphasis added). We also agree with the trial court's reasoning that "regardless of whether taking the Klonopin was suicidal in nature, it is a

sign of drug abuse."

D.

Having found factors one, two, and seven established in the record, we are unconvinced the trial court erred in considering factors twelve, thirteen, fourteen, and fifteen and find the trial court based its findings on substantial, credible evidence in the record. See Cesare, 154 N.J. at 412.

The trial court's finding on factor twelve, that there was "prior involuntary commitment in a hospital or treatment facility," is supported by evidence of the 2011 commitment, along with the 2022 involuntary commitment that led to the FERPO. Factors thirteen, fourteen, and fifteen were established by defendant's own testimony that he continues to receive mental health treatment, by regularly seeing a psychologist and a psychiatrist, receiving treatment at a mental health clinic, and taking a variety of psychiatric medications for diagnosis of anxiety and bipolar disorders.

E.

We are unconvinced defendant was deprived of due process by way of proffering W.R.'s testimony since he invited the error now raised on appeal.

Under the invited error doctrine, trial errors that "were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are

16                                                          A-2730-22

not a basis for reversal on appeal . . . ." State v. Corsaro, 107 N.J. 339, 345 (1987) (alteration in original) (quoting State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974)). The doctrine is grounded in considerations of fairness and is intended to prevent defendants from manipulating the system. State v. A.R., 213 N.J. 542, 561 (2013). "'[D]efendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought[,] . . . claiming it to be error and prejudicial.'" State v. Jenkins, 178 N.J. 347, 358 (2004) (quoting State v. Pontery, 19 N.J. 457, 471 (1955)).

Defense counsel could have objected after the court ruled it would accept the proffer as to W.R.'s testimony, but did not do so. In issuing its ruling, the trial court accepted the proffer as to W.R.'s testimony, finding defendant did not make any statements to W.R. as to the ingestion of Klonopin and his mental state on the evening of the incident.

We discern no plain error[3] since, even if the trial court dealt with the issue in a cursory manner, the process did not "'cut mortally into the substantive rights

---

[3] See R. 2:10-2 ("[T]he appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court."); see also

17

of [] defendant.'" See Corsaro, 107 N.J. at 345 (alteration in original) (quoting Harper, 128 N.J. Super. at 277).

F.

Although defendant argues the Act is unconstitutional as applied to him, we decline to substantively adjudicate the issue where defendant failed to comply with Rule 4:28-4, requiring notice to the New Jersey Attorney General (AG) of a constitutional challenge to any state statute. Defendant's non-compliance deprived the AG of the right to participate before the trial court and this court on appeal.[4]

Were we to look beyond this fatal error, defendant's generalized assertions fail to establish the Act is inconsistent with prevailing jurisprudence, which

---

Corsaro, 107 N.J. at 348 ("The question . . . is whether [the purported error] was 'clearly capable of producing an unjust result.'") (citing R. 2:10-2).

[4] Rule 4:28-4 states in pertinent part:

> (a) Actions Involving Validity of Statute, Ordinance, etc.; Unknown Owners.
>
> (1) State enactments; unknown owners. If the validity of a State constitutional provision or of a statute, rule, regulation, executive order or franchise of this State is questioned in any action to which the State or an agency or officer thereof is not a party, the party raising the question shall give notice of the pendency of the action to the Attorney General.

A-2730-22

permits a state to restrict rights to possess firearms in certain instances. To this end, defendant's categorical reliance on N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022), that "a person does not have to live a perfect life to be eligible to enjoy Second Amendment rights," is not dispositive of the issue before us. Even pre-Bruen, the United States Supreme Court acknowledged state-imposed limitations on the right of individuals diagnosed with mental illness to possess firearms. See District of Columbia v. Heller, 554 U.S. 570, 626 (2008) ("[N]othing in our opinion should be taken to cast doubt on long-standing prohibitions on the possession of firearms by . . . the mentally ill . . . ."); see also McDonald v. City of Chicago, 561 U.S. 742, 786 (2010) ("We made it clear in Heller that our holding did not cast doubt on such long-standing regulatory measures as 'prohibitions on the possession of firearms by . . . the mentally ill . . . .") (quoting Heller, 554 U.S. at 626).

New Jersey decisional law is in accord, with the Court recognizing "the right to bear arms under the Second Amendment to the United States Constitution is subject to reasonable limitations." In re Forfeiture of Pers. Weapons & Firearms Identification Card belonging to F.M., 225 N.J. 487, 506 (2016) (citing Heller, 554 U.S. at 626). "The police power of the state provides our Legislature with the authority to regulate firearms and establish such

'reasonable limitations' on their ownership." Id. at 506-07 (citing McDonald, 561 U.S. at 901) ("[T]he very text of the Second Amendment calls for regulation, and the ability to respond to the social ills associated with dangerous weapons goes to the very core of the States' police powers."); see also Crespo v. Crespo, 201 N.J. 207, 210 (2010).

The Court's decision in F.M. likewise recognized that individuals with a diagnosed mental illness may be disqualified from owning firearms under N.J.S.A. 2C:58-3(c)(5). F.M., 225 N.J. at 513; see also In re M.U.'s Application for a Handgun Purchase Permit, 475 N.J. Super. 148, 163-64 (App. Div. 2023) (holding the denial of the petitioner's application for a handgun purchase permit under N.J.S.A. 2C:58-3(c)(5), does not violate the petitioner's Second Amendment rights because of the petitioner's "multiple instances of negative police interactions . . . .").

Here, notwithstanding the procedural infirmity precluding review of this issue, we note that defendant fails to establish the Act is not within the continuum of permissible, lawful restrictions authorized under federal and state jurisprudence to protect the public. See M.U., 475 N.J. Super. at 193 ("[I]ndividuals whose armament poses a risk to public health, safety or welfare, as evidenced by their record of misconduct that evinces a disrespect for the rule

of law, are likewise beyond the ambit of the people protected by the Second Amendment.") (internal quotation marks omitted). Thus, not only is defendant's limited constitutional argument procedurally barred but we also remain substantively unconvinced based on the minimal legal precedent and analysis submitted by the parties on the issue.

To the extent we have not specifically addressed any of defendant's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division